# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF GEORGIA
# VALDOSTA DIVISION

| | |
|---|---|
| EVERRET LEE MAUPIN and<br>BILL MAUPIN,<br><br>    Plaintiffs,<br><br>v.<br><br>ALLIANZ LIFE INSURANCE COMPANY<br>OF NORTH AMERICA,<br><br>    Defendant. | Civil Action: 7:08-CV-138 (HL) |

## ORDER

This case is before the Court on Plaintiff's Motion for Partial Summary Judgment (Doc. 20) and Defendant's Motion for Summary Judgment (Doc. 22). The Court has reviewed the briefs and evidence filed by the parties, and also held oral argument on the Motions. After consideration of all the arguments and evidence presented, the Court denies Plaintiff's Motion for Partial Summary Judgment and grants Defendant's Motion for Summary Judgment. The Court also dismisses Defendant's counterclaim (Doc. 6) as moot.

## I. FACTS

On September 5, 2006, on the advice of Plaintiff Everret Lee Maupin and insurance agent Roy Daniel Murphy, Juanita Maupin applied for life insurance from Defendant. (Doc. 20-2, p. 6; Doc. 22-6). She applied for a death benefit in the amount of $100,000, along with a long term care rider. The application completed by Ms. Maupin (the "Application") states that the insurance requested may not be

issued by Defendant, and that Defendant may require an amendment to reflect a changed status. (Doc. 22-6). Ms. Maupin was cautioned that she was to answer all questions "completely and truthfully," and that "if my answers are not complete and true, my policy may not be valid." (Id.) She also submitted a one-time premium of $36,683.87 to Defendant at the time she completed the Application. (Doc. 20-2, p. 7).

Defendant did not approve the Application as submitted. Defendant did agree to issue a death benefit in the amount of $100,000, but declined to issue the long term care rider. (Doc. 20-2, p. 8).

During the first week of December of 2006, Defendant delivered a policy to Old World Financial, the insurance agency where Mr. Murphy was employed, for delivery to Ms. Maupin.[1] The named insured under the policy was Juanita Maupin, and the listed effective date was November 28, 2006. (Docs. 20-2, p. 4; 20-4, p. 46). The policy did not include the long term care rider initially requested by Ms. Maupin

---

[1] It is undisputed that Mr. Murphy was an independent insurance agent. He and Old World Financial were designated as independent contractors and were free to contract with insurance companies other than Defendant. The Agent Agreement entered into between Defendant and Mr. Murphy specifically says that Defendant recognizes "the special relationship [Mr. Murphy] [has] with those to whom you have sold a policy; they are your clients." Georgia law is clear that "[i]ndependent agents or brokers are generally considered the agent of the insured, not the insurer." Pope v. Mercury Indem. Co. of Ga., 297 Ga. App. 535, 540, 677 S.E.2d 693, 698 (2009). While Plaintiffs mention in their response to the Court's July 27, 2010 order that Mr. Murphy could be considered a dual agent of both Ms. Maupin and Defendant, they have provided no evidentiary support for that argument and did not make that argument during the summary judgment briefing.

in the Application. Defendant also delivered to Old World Financial a Policy Delivery Receipt and an Amendment to Application, both for Ms. Maupin's signature. The Policy Delivery Receipt, which was to be signed by Ms. Maupin to acknowledge delivery and receipt of the life insurance policy, specifically states that it had to be signed by the owner/insured and agent and returned to Defendant's home office. The Amendment, which was to be signed by Ms. Maupin to acknowledge that the long term care rider was not issued, similarly states that it was to be returned to the home office. (Docs. 22-9 and 22-10).

Also during the first week of December of 2006, Mr. Murphy and Plaintiff Everret Maupin delivered the policy, Policy Delivery Receipt, and Amendment to Ms. Maupin. During that meeting, Ms. Maupin signed the Policy Delivery Receipt and Amendment ("the December Documents"). (Doc. 20-2, p. 10). Mr. Murphy took the December Documents back to his office, where the office staff was supposed to make copies and forward the originals to Defendant. (Id.) For some unknown reason, however, Defendant never received the December Documents. They were apparently misplaced at some point after Mr. Murphy gave them to the staff at Old World, and no copies exist.

Defendant subsequently contacted Old World and informed the staff, who in turn informed Mr. Murphy, that the December Documents were never received and that Ms. Maupin needed to sign another Policy Delivery Receipt and Amendment. (Doc. 20-2, p. 11). Ms. Maupin signed another Policy Delivery Receipt (the "January

Delivery Receipt") and another Amendment (the "January Amendment") (collectively the "January Documents") on January 23, 2007. (Docs. 22-9 and 22-10).

By signing the January Amendment, Ms. Maupin authorized Defendant to amend the Application. The January Amendment specifically states that it is to "form a part of said application and a copy attached to the policy." (Doc. 22-10). In signing the January Amendment, Ms. Maupin acknowledged that the long term care rider had been deleted from coverage. (Id.)

The January Amendment also contains the following language:

> Since the date of the original application of this policy, the proposed insured(s) and any family members proposed for insurance in the application: (a) have not applied for insurance which was declined, postponed, or modified; and (b) have no application for insurance pending with another company; and (c) have not suffered an illness or an injury; and (d) have not consulted or been examined by a physician or practitioner; and (e) have not changed occupations EXCEPT AS FOLLOWS:

(Id.)

Ms. Maupin did not list any exceptions on the January Amendment. By signing the January Amendment, Ms. Maupin represented to Defendant that she had not consulted or been examined by a physician or practitioner since the date of the Application. (Id.) Mr. Murphy admitted during his deposition that he did not review the language contained in the January Amendment with Ms. Maupin prior to her signing it, and he did not ask her if she had any problems since the time of the Application. (Doc. 20-2, pp. 11-12).

4

Mr. Murphy forwarded the January Documents to Defendant on February 15, 2007. (Doc. 20-2, p. 12). After receiving the January Documents, Defendant issued a policy with an effective date of March 19, 2007. (Docs. 22-11 and 22-12). There is no evidence in the record showing whether Ms. Maupin received a copy of the March policy or not.

On January 2, 2007, prior to signing the January Amendment, Ms. Maupin visited Gregory S. Beale, M.D., complaining of coughing and congestion, wheezing and shortness of breath. (Doc. 22-13). On January 8, 2007, also prior to signing the January Amendment, Ms. Maupin underwent pulmonary function testing ordered by Richard Wheeler, M.D., at South Georgia Medical Center in Valdosta. (Id.) The pulmonary function testing revealed that, among other things, Ms. Maupin was suffering from a diffusion capacity with an uncorrected DLCO severely decreased at 45% of predicted and a corrected DLCO: VA ratio severely decreased at 50%. (Id.)

Ms. Maupin did not disclose either the January doctor's visit or pulmonary testing to Defendant on the January Amendment or at any time prior to her death. (Doc. 22-10).

Ms. Maupin died from lung cancer on December 17, 2007. (Doc. 22-5, p. 20). Plaintiffs, the named beneficiaries, subsequently submitted a claim to Defendant for death benefits. (Id. at p. 14).

After the claim was made, Defendant conducted a claim review. Defendant ordered Ms. Maupin's medical records and discovered the January doctor visit and

pulmonary function testing. (Doc. 22-12, pp. 11-12). Defendant determined that Ms. Maupin should have advised them about the pulmonary function testing, and that had it "been made aware of this visit with the new complaint of shortness of breath and combo with severely-decreased DLCO result on this testing, our reaction would have been to decline." (Doc. 22-8, pp. 12-13).

The policy contains a contestability provision which states, in part:

> This policy and any attached Riders or Endorsements were issued based on the information you provided in the application. Any misrepresentations on the application may cause this policy to be voided or rescinded, or a claim to be denied. After this policy and any attached Riders or Endorsements have been in effect during the Insured's lifetime for a period of two years from the Policy Date or from the date of reinstatement, this policy shall become incontestable as to a misstatement made in the application.

(Docs. 20-4, p. 8; 22-11, p. 31).[2]

As the death claim was made within the two-year contestability period, and based on the misrepresentations in the January Amendment, Defendant rescinded the insurance policy and refunded the premium paid by Ms. Maupin to Plaintiffs. (Doc. 22-14). Plaintiffs returned the premium refund check to Defendant and filed this lawsuit.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment must be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue

---

[2]This language is contained in both the November and March policies.

to any material facts and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact arises only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510 (1986).

When considering a motion for summary judgment, the Court must evaluate all of the evidence, together with any logical inferences, in the light most favorable to the nonmoving party. Id. at 254-55. The Court may not, however, make credibility determinations or weigh the evidence. Id. at 255.

The nonmoving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of a material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553 (1986) (internal quotation marks omitted). If the moving party meets this burden, the burden shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact, or that the nonmoving party is not entitled to judgment as a matter of law. Id. at 324-26. If the evidence that the nonmovant presents, however, is "not significantly probative" or is "merely colorable," then summary judgment may be granted. Liberty Lobby, 477 U.S. at 249. This evidence must consist of more than mere conclusory allegations. See Avrigan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991). Summary judgment must

7

be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

III. ANALYSIS

A. Plaintiffs' Motion for Partial Summary Judgment

Plaintiffs argue that they are entitled to judgment as a matter of law because Defendant issued a policy to Ms. Maupin with an effective date of November 28, 2006. They contend that Defendant is bound by that policy. Plaintiffs argue that the fact Defendant did not receive the December Documents is irrelevant, and also argue that the January Amendment is not part of the policy and is a nullity.

1. The January Amendment as part of the policy

Plaintiffs initially argue that the January Amendment cannot be considered part of the policy under the express language of the policy. The Court disagrees.

The policy provides that the "Entire Contract" consists of the policy, any attached endorsements, any attached riders, and attached applications. It also provides that the Application is part of the policy. The Application specifically says that Defendant "reserves the right to make necessary changes in this application based on information received. Changes made by the Company will be attached as either a Home Office Change or an amendment to the application and will become part of the entire contract." (Doc. 20-4). The January Amendment also states that the "amendment is to form a part of said application. . . ." (Doc. 22-10). It is clear that the

8

January Amendment is part of the Application, which is part of the policy. Thus, Plaintiffs' argument is without merit.

## 2. Formation of contract on November 28, 2006

Plaintiffs next argue that by issuing a policy to Ms. Maupin with an "effective date" of November 28, 2006, a contract was formed between the parties. There is no dispute that Ms. Maupin signed and submitted an application for a death benefit of $100,000 and a long term care rider in September of 2006. It is also undisputed that Defendant decided to provide the death benefit, but not the long term care rider.

"An application for insurance is a mere offer, and the [insurance] company is free to accept or reject it. Unless the offer is accepted by the company no contract ever comes into existence and no liability can rise." Robertson v. Life Ins. Co. of Ga., 196 Ga. App. 294, 296 S.E.2d 35 (1990) (quoting Whitmire v. Colonial Life & Cas. Ins. Co., 172 Ga. App. 651, 652, 323 S.E.2d 843 (1984)).

Plaintiffs contend that by issuing the policy to Ms. Maupin in November, Defendant accepted her offer made through the Application. Under Georgia law, however, an "'effective date'. . . does not determine whether the parties entered into a contract. Rather, a contract of life insurance is consummated upon the unconditional written acceptance of the application for insurance by the company to which the application is made." Southwestern Life v. Middle Ga. Neurological Specialists, 262 Ga. 273, 275, 416 S.E.2d 496 (1992) (citation omitted).

The facts presented in this case show that Defendant did not unconditionally accept Ms. Maupin's offer for a contract of insurance. Instead, Defendant made a

9

counteroffer, which is reflected in the Amendment, as Defendant declined to provide long term care coverage as requested in the Application.

The act of issuing a policy, regardless of the "effective date" contained therein, does not constitute acceptance on the part of Defendant of Ms. Maupin's offer made through the Application. A case decided by the Georgia Court of Appeals in 1978 is instructive on this point. In Grissette v. American National Ins. Co., 147 Ga. App. 731, 250 S.E.2d 183 (1978), the plaintiff applied for a family life policy with the defendant. In the application, the plaintiff proposed his son to be included as an insured under the policy. The application contained a provision which read: ". . . the company is authorized to amend this application. . . ." Id. at 732. The defendant deleted the son from coverage and issued a policy with a specific provision in an attached modification of the application rider that no coverage was provided for the son. The policy rider, which required the plaintiff's signature, was delivered to the plaintiff's wife, who signed her husband's signature without his consent. The son later died and the plaintiff sought to recover under the policy. Id.

The Court of Appeals affirmed a directed verdict in the defendant insurance company's favor. The court noted that "[i]nsurance is a matter of contract and the consent of all the parties it [sic] essential to complete the contract." Id. (citation omitted). The court went on to hold that "[t]he application listing Timothy as a proposed insured was nothing more than a simple offer to purchase an insurance policy. Defendant refused to accept this offer but made a counter offer by issuing a policy deleting Timothy as a covered person. If plaintiff did not sign and agree to this

counter offer, then no insurance contract resulted." Id. Similarly, Defendant here refused to accept Ms. Maupin's offer, but made a counteroffer by issuing a policy without the long term care rider. Ms. Maupin had to sign the Amendment to agree to the counteroffer, and only then would an insurance contract result.

The question then becomes, what about the documents signed by Ms. Maupin in December? The evidence in the record shows that Ms. Maupin initially signed the Amendment and Policy Delivery Receipt in December of 2006, but those were misplaced by her insurance agent and were never received by Defendant. Was a contract formed when Ms. Maupin signed the documents in December? The answer is no. There is unrebutted testimony in the record that the Policy would not be in force and effect until Defendant received the signed Amendment and Policy Delivery Receipt. (Deposition of Victoria Rath, Doc. 22-8, pp. 23, 34, 47). Those documents were not received until February of 2007. Thus, the Policy could not have been in effect on November 28, 2006. Both the Amendment and Policy Delivery Receipt state that they must be returned to Defendant's home office, and both had to be signed by Ms. Maupin. "[I]t is the law of contracts that an acceptance of a bilateral contract requires communication. 'Where an express acceptance by the opposite party is required by the offer in order to establish a contract, the fact of such subsequent acceptance must be communicated to the offerer by the opposite party . . . and a mere private uncommunicated assent would not effect an agreement.'" Hartford Life Ins. Co. v. Steenhuis, 115 Ga. App. 625, 626, 155 S.E.2d 690, 692 (1967) (quoting Federal Farm Mortgage Corp. v. Dixon, 185 Ga. 466, 469, 195 S.E.

414, 415 (1938)). While Ms. Maupin signed the documents in December, her acceptance of the policy, which was required for the policy to become effective, had to be communicated to Defendant through the receipt of the signed documents by Defendant.[3] There is no dispute that Defendant never received the December documents. The only documents received by Defendant showing Ms. Maupin's acceptance of Defendant's counteroffer were the January Documents. No valid insurance contract could have been formed until after February 15, 2007, which was when Defendant received the January Documents. The insurance contract is reflected in the policy issued with an effective date of March 19, 2007. While there is some question as to whether Ms. Maupin ever received the March policy, as Plaintiffs themselves recognize, it is not necessary for a policy to be delivered to the insured before it becomes effective. See Surety Group, Inc. v. Ragsdale, 197 Ga. App. 437, 438, 398 S.E.2d 718, 719 (1990). Unfortunately, by the time the contract was formed, Plaintiff had made the misrepresentation which voids the policy as a matter of law, as further discussed below.

---

[3]Even if the Amendment and Policy Delivery Receipt did not specifically state that they were to be returned to Defendant's home office, the Georgia Court of Appeals held in an insurance coverage case where neither the policy nor a endorsement to be signed by the insured required that the endorsement be returned to the insurer after it had been signed by the insured that signing the endorsement alone was not sufficient to make the terms of the endorsement effective because the insured's acceptance of the contract was not communicated to the insurer. Hartford Fire Ins. Co., 115 Ga. App. at 625.

## B. Defendant's Motion for Summary Judgment

Defendant contends that it is entitled to judgment as a matter of law on Plaintiffs' claim for the policy proceeds because Ms. Maupin made a material misrepresentation that voided the policy. Defendant seeks judgment in its favor on Plaintiffs' bad faith and attorney's fees claims as well. Defendant also argues that it is entitled to summary judgment on its counterclaim for rescission.

### 1. Misrepresentation

Under Georgia law, misrepresentations and incorrect statements shall not prevent a recovery under an insurance policy unless:

> (1) Fraudulent;
>
> (2) Material either to the acceptance of the risk or to the hazard assumed by the insurer; or
>
> (3) The insurer in good faith would either not have issued the policy or contract or would not have issued a policy or contract in as large an amount or at the premium rate as applied for or would not have provided coverage with respect to the hazard resulting in the loss of the true facts had been known to the insurer as required either by the application for the policy or contract or otherwise.

O.C.G.A. § 33-24-7.

Ms. Maupin made a misrepresentation on the January Amendment when she stated that she had not been to see a physician since the date of the Application. The evidence is undisputed that Defendant would not have provided coverage had it known about the doctor visit with the new complaint of shortness of breath in combination with the severely decreased DLCO result on the pulmonary function

13

testing. Therefore, the misrepresentation were material as a matter of law under O.C.G.A. § 33-24-7. Whether Ms. Maupin acted in good faith in completing the January Amendment is immaterial. Davis v. John Hancock Mut. Life Ins. Co., 202 Ga. App. 3, 5, 413 S.E.2d 224, 226-27 (1991). Summary judgment in Defendant's favor is appropriate. Plaintiffs are precluded from recovering because of the material misrepresentation made by Ms. Maupin in the January Amendment, and Defendant is entitled to rescind the policy.

### 2. Bad faith penalties and attorney's fees

O.C.G.A. § 33-4-6(a) provides, in pertinent part, that in the event of a loss which is covered by insurance and the refusal of the insurer to pay the loss within 60 days after a demand has been made by the holder of the policy and a finding has been made that such refusal was in bad faith, the insurer shall be liable to pay the holder of the policy, in addition to the loss, not more than 50 percent of the liability or $5,000, whichever is greater, and all reasonable attorney's fees for the prosecution of the action against the insurer. Plaintiffs contend that they are entitled to a penalty payment and attorney's fees, as Defendant acted in bad faith in refusing to pay under the policy.

The Court finds that Defendant is entitled to summary judgment on Plaintiffs' bad faith and attorney's fees claims. "To support a cause of action under O.C.G.A. § 33-4-6, the insured bears the burden of proving that the refusal to pay the claim was made in bad faith." S. Fire & Cas. Ins. Co. v. Northwest Ga. Bank, 209 Ga. App. 867, 434 S.E.2d 729 (1993) (citations omitted). Plaintiffs have not shown that

14

Defendant acted in bad faith in failing to pay the death benefit. Further, "[p]enalties for bad faith are not authorized where the insurance company has any reasonable ground to contest the claim and where there is a disputed question of fact." Id. (citations and punctuation omitted). Reasonable grounds existed here. *See* Florida Intern. Indem. Co. v. Osgood, 233 Ga. App. 111, 116, 503 S.E.2d 371, 375 (1998) (holding that reasonable grounds to contest a claim existed where the insured made a misrepresentation on his insurance application and the application and policy provided that material misrepresentations voided the policy).

### C. Rescission

Defendant has also moved for summary judgment on its counterclaim in which it requests a ruling that the policy is rescinded pursuant to O.C.G.A. § 13-4-60. The Court has already determined that Defendant is entitled to rescind the policy under O.C.G.A. § 33-24-7 because of the material misrepresentation in the January Amendment. As the relief requested in the counterclaim has already been given to Defendant, albeit under a different statute, Defendant's counterclaim is dismissed as moot.

## IV. CONCLUSION

For the reasons discussed herein, Plaintiffs' Motion for Partial Summary Judgment (Doc. 20) is denied. Defendants' Motion for Summary Judgment (Doc. 22) is granted. Defendant's counterclaim (Doc. 6) is dismissed as moot. Defendant is directed to return the premium in the amount of $36,682.87 to Plaintiffs.

15

**SO ORDERED**, this the 16th day of August, 2010.

*s/ Hugh Lawson*
**HUGH LAWSON, SENIOR JUDGE**

mbh